710 P.2d 502

STATE of Idaho, Plaintiff-Respondent,

v.

Thomas CREECH, Defendant-Appellant.

No. 15475.

Supreme Court of Idaho.

June 20, 1985.

Rehearing Denied Dec. 31, 1985.

Alan E. Trimming and Rolf M. Kehne of Ada County Public Defender's Office, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., and Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent.

DONALDSON, Chief Justice.

This appeal involves defendant's post-conviction relief proceedings. The circumstances leading up to defendant's conviction and sentencing are set out in *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983) *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed. 722 (1984). The proceedings subsequent to defendant's sentencing were as follows.

On May 19, 1983, defendant filed a motion to withdraw his guilty plea. The mo-

tion was filed pursuant to I.C.R. 33(c) and alleged the following:

"1) the guilty plea in this case was accepted conditionally because the psychological examinations were not reported or finished by the time of the guilty plea ...;

"2) At the time of his guilty plea the appellant believed he had no defenses to the charge and he knowingly waived no defenses;

"3) appellant now realizes that the unprovoked, deadly-force attack on him by David Jensen negates the malice needed to make a killing murder;

"4) appellant never knowingly or intentionally waived the right to take his case to a jury authorized by law to convict him of manslaughter, a lesser included offense of murder;

"5) appellant now realizes that the psychological testing gives him a legal defense to the charge in that as Mr. Creech exceeded the lawful bounds of self-defense he did so because, due to mental disease or defect, he lost capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law;

"6) at the time of his plea the appellant had no idea he had an insanity defense to the charge and he did not knowingly, intelligently waive this defense;

"7) Tom Creech believed that his life would be in jeopardy from the administration of the prison if he revealed the causes and events which led to Jensen's attack upon him;

"8) threats were made upon the lives of appellant's family after his not guilty plea which pressured him to waive his trial and plead guilty;

"9) defendant's guilty plea was caused by improper medical care:

"(a) during the period of time his case was before the district court, Tom Creech needed medication to maintain his brain chemistry in normal balance;

"(b) during the pendency of this case before the guilty plea the defend-

ant was not maintained on his prescribed, antidepressant medication;

"(c) the interruption of the defendant's prescription medicines by the neglect of State medics caused the suicidal depression which led defendant to plead guilty."

Four days later, on May 23, 1983, this Court filed its opinion affirming defendant's conviction and death sentence. On May 27, 1983, the district court heard arguments by both parties as to whether a hearing would be necessary on defendant's motion to withdraw his plea. The district court denied the defendant's request for a hearing and took the matter under advisement. Then, on June 23, 1983, the district court issued an order refusing to rule on defendant's motion to withdraw his plea until defendant's direct appeal was finally remitted and returned to the district court by the Idaho Supreme Court. The remittitur was subsequently issued by the Supreme Court on September 21, 1983. In the meantime, however, the defendant appealed the district court's refusal to rule on his motion to withdraw his guilty plea. On January 24, 1984, this Court dismissed that appeal because the district court's order was not an appealable order and remanded the case immediately for all further proceedings on all pending matters. That same day, the district court, in response to the Supreme Court's remand, issued the following order:

"The Supreme Court of the State of Idaho having returned and remitted this case back to this court for further proceedings on all pending matters, in accordance with its Order dated January 24, 1984, and it appearing to this court that all remaining post trial matters should be rigidly structured by this court so as to expeditiously handle such matters, and prevent excessive delay, and good cause appearing therefore:

"IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that all Uniform Post-conviction act proceedings, Habeas Corpus proceedings, and all other post trial motions of either party, be filed with this court not later than Febru-

ary 6, 1984. Any not filed will be deemed by this court to be waived by the parties hereto. Hearing on these matters, if any, shall commence February 21, 1984, at 10:00 a.m., and continue thereafter until completely disposed of by this court.

"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that a hearing under the provisions of § 19–2715 of the Idaho Code is set by this court, on its own motion, for Monday, February 27, 1984 at 9:00 a.m., in front of this court."

Pursuant to that order, defendant renewed his motion to withdraw his guilty plea. No other post-conviction relief was requested by defendant. On February 21–23, and February 27, 1984, all evidence admitted in prior proceedings was judicially noted and testimony was received on defendant's motion. Then, on March 6, 1984, the district court issued the following order:

"This court, after considering the defendant's Motion to Withdraw his Guilty Plea, denies his request. (See Rule 33(c) of the Idaho Criminal Rules) Thomas Eugene Creech's plea and my sentence will stand! No Manifest injustice has been shown. A sentence of death is a tragic and extraordinary penalty, but when it is legally and properly imposed, execution must follow, or surely we are not a nation ruled and governed by law.

"IT IS SO ORDERED."

Defendant now appeals, challenging the district court's denial of his motion, the lack of findings supporting the district court's denial and the propriety of the district court's January 24, 1984, order consolidating all of defendant's post-conviction motions into one proceeding.

## I.

■ I.C.R. 33(c) establishes the standard for withdrawal of a guilty plea. That section provides: "A motion to withdraw a plea of guilty may be made only before sentence is imposed or imposition of sentence is suspended; but to correct manifest injustice the court after sentence may set aside the judgment of conviction and permit the defendant to withdraw his plea."

"This distinction rests upon practical considerations important to the proper administration of justice.... Before sentencing, the inconvenience to court and prosecution resulting from a change of plea is ordinarily slight as compared with the public interest in protecting the right of the accused to trial by jury. But if a plea of guilty could be retracted with ease *after* sentence, the accused might be encouraged to plead guilty to test the weight of potential punishment, and withdraw the plea if the sentence were unexpectedly severe.... The result would be to undermine respect for the courts and fritter away the time and painstaking effort devoted to the sentencing process." (Emphasis in original). *Russell v. State,* 105 Idaho 497, 500, 670 P.2d 904, 907, (Ct.App.1983) (quoting *Kadwell v. United States,* 315 F.2d 667, 670 (9th Cir.1963)).

In this instance, defendant's motion was filed after sentence was imposed by the district court. Therefore, the district court's inquiry should have, and apparently was, focused on whether manifest injustice would result by not allowing defendant to withdraw his guilty plea. The district court found no manifest injustice in allowing defendant's guilty plea to stand.

A motion to withdraw a guilty plea is addressed to the sound discretion of the district court. *Kienlen v. U.S.,* 379 F.2d 20, 24 (10th Cir.1967). "With these principles in mind we must look to the whole record before us to determine whether it is manifestly unjust to preclude withdrawal of [defendant's] guilty plea." *Id.* In his motion to withdraw his guilty plea, the defendant enumerated nine grounds for allowing the withdrawal. These grounds can be synthesized into five grounds. Each will be reviewed in turn. First, in allegations 1, 5 and 6, the defendant submits that he entered his plea conditionally. His position is based on the following colloquy that occurred on Friday, August 28, 1981, when defendant entered his guilty plea.

"Mr. Kehne: I would just like to state that Mr. Creech has been seen by Dr. Stoner for psychiatric evaluations, and those evaluations are not completed at this time. We would like to reserve the right to come back to the court and withdraw the plea if it turns out Mr. Creech is in some way not competent to make this decision.

"The Court: I gather you have no objection to that, Mr. Harris?

"Mr. Harris: No.

"The Court: The court is certainly going to rely on this report before I make any changes."

On December 8, 1981, Dr. Stoner issued a report which could be the basis for an insanity defense. He testified at the sentencing hearing on January 11, 1982, that at the time of the murder, the defendant was incapable of understanding the wrongfulness of his conduct. The defendant filed his motion to withdraw his guilty plea on May 19, 1983, almost a year and a half later. Defendant maintains that until he studied the appeal briefs he did not understand what Dr. Stoner's testimony could mean for him. Defendant also claims that during this time lag his counselors and family talked him into withdrawing his plea.

The State points to several flaws in defendant's position. The State first asserts that the most damaging evidence against Creech on this point is the time lag between the completion of Dr. Stoner's psychiatric examination and defendant's motion to withdraw his plea. It is the State's position that defendant's claim that he didn't understand the consequences of Dr. Stoner's report until a year and a half after it was issued is hard to believe, especially since the question of defendant's sanity was reviewed at his sentencing hearing, defendant's history shows that he has changed his story about what happened many times, and defendant admits to lying in order to manipulate the court. Moreover, the State points out that at the time of sentencing defendant was being represented by his present attorney who certainly knew the consequences of the report. Finally, the State submits Dr. La Marr Heyrend's testimony from the sentencing hearing. Dr. Heyrend had also examined defendant and testified that defendant did appreciate the wrongfulness of his conduct.

The defendant's next argument in support of his motion, based on allegations 2 through 4, is that his defense of self-defense to the first degree murder charge was not knowingly and intentionally waived. Defendant's position is embodied in the following:

"A. [Creech] Well, first of all, I thought that I was charged with first degree murder, which I had been told when that new law was passed, that anybody that killed another inmate in prison that was already doing time for murder, that it was automatic first degree murder.

"Q. [Mr. Kehne] By the time you wrote that letter, had you and any attorneys talked about the difference between manslaughter and first degree murder surrounding the case?

"A. No."

Defendant again maintains that the time lag between when he entered his guilty plea and when he filed his motion was attributable to the fact that until he read his appeal briefs he didn't understand that he had a possible defense.

The State's response to defendant's position is two pronged. First, the State contends that defendant did not kill in self-defense and thus is guilty of first degree murder. In support of their theory, the State introduced defendant's prior testimony that he intended to kill Jensen, that he planned the murder in advance and that part of that plan may even have been to make it appear that he was acting in self-defense. Second, the State contends that defendant knew exactly what charge he was pleading guilty to and that he knew that he was waiving all defenses by pleading guilty. In support of this theory, the State introduced defendant's prior testimony that he knew the charge and the consequences of his guilty plea. The State also

suggests that based on defendant's extensive involvement in prior murder trials involving self-defense, defendant was well aware of the difference between manslaughter and murder.

The defendant's third argument in support of his motion is based on allegation 7. The defendant's exact position on this point is a bit hazy. It seems to be either that he pled guilty because that is what he thought the prison authorities wanted him to do, or that his statement about his intentions of committing the murder and his guilt were contrived so that he would not have to return to the penitentiary and face harassment from the other inmates and guards. In either case, the only evidence supporting Creech's position is his own testimony.

Defendant's fourth argument in support of his motion is based on allegation 8. Defendant's position is that he pled guilty because of threats to his family. However, defendant offers no evidence other than his own assertions to support this argument.

Finally, in allegation 9, defendant maintains that the interruption of his medication by state medics caused him to become suicidally depressed and that is why he pled guilty. Again, defendant's only evidence for these assertions is his own testimony.

A review of the proceedings during which defendant entered his plea also reveals that defendant was fully advised of his right to plead not guilty, that he was questioned concerning his knowledge of the charge, that he was advised of the sentencing consequences of a guilty plea to first degree murder, and that he was informed that by pleading guilty he would relinquish the constitutional protections provided by a trial. The record shows that the court made every reasonable attempt to make certain the appellant's plea was entered voluntarily and with a full understanding of its import. *See State v. Ruth*, 98 Idaho 879, 574 P.2d 1357 (1978). Defendant was represented by counsel prior to the hearing when he entered his guilty plea and his counsel was present at the hearing. Although defense counsel asked to be dismissed from the case because defendant refused to comply with his advice, the district court refused so that defendant could continue to have the advice of counsel. The defendant was not, as the dissent alleges, "encouraged" by the district court to plead guilty. As the dissent notes, the transcript *is* very telling:

"Q. When did you decide to plead guilty?

"A. I have been thinking about it ever since I was arrested for this charge.

"Q. Why did you decide to plead guilty?

"A. Because I am guilty.

"Q. Are you pleading guilty freely and voluntarily?

"A. Yes, sir.

"Q. I gather that you discussed this matter of pleading guilty with your attorney?

"A. Yes, sir. My attorney advised me not to plead.

"Q. And I gather that, for the record, is Mr. Kehne?

"A. Yes, sir.

"Q. Do you feel you have had sufficient time to discuss this matter with Mr. Kehne?

"A. Yes, sir.

"Q. Have you explained to Mr. Kehne everything you know about this charge?

"A. Yes, sir.

"Q. Has Mr. Kehne advised you to your satisfaction of your rights, defenses, and the possible consequences to you of a plea of guilty?

"A. Yes, sir.

"Q. And I gather that this is your own free wishes here today?

"A. Yes, sir.

"Q. This is what you want to do, even considering the wishes of your counsel?

"A. Yes.

"Q. Are you satisfied other than this last point at least with your attor-

ney's representation of you in this matter?

"A. Yes, sir.

. . . .

"Q. And after all these questions, Mr. Creech, and everything I have asked you and after talking to your attorney this morning, which I gave you an opportunity to do, do you still want to plead guilty?

"A. Yes sir."

As in *Faretta v. California,* 422 U.S. 806, 817, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975), "we confront here a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." Based on an entire review of defendant's proceedings to date, we affirm the district court's finding that it would not be manifestly unjust to allow defendant's guilty plea to stand.

■ The defendant further contends that the district court should have included detailed findings of fact and conclusions of law in its order denying defendant's motion. While written findings may be required in rulings on motions brought pursuant to the Uniform Post-Conviction Relief Act, nothing in I.C.R. 33(c) requires a trial court to make written findings when ruling on a motion to withdraw a guilty plea after sentencing.[1] Therefore, the district court's order was adequate.

## II.

■ The defendant also challenges the propriety of the January 24 order consolidating all of defendant's post-conviction motions. Defendant first claims that it was fundamentally unfair for the district court to so limit the time period within which he was required to raise his post-conviction motions. However, the United States Supreme Court has approved the use of summary procedures for the expeditious resolution of collateral proceedings in death penalty cases. *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed. 1090 (1983). In this case, defendant was initially sentenced by the district court on January 25, 1982. His sentence was affirmed by this Court on May 23, 1983. It was not until January 24, 1984, that defendant was required to make his final post-conviction challenges. Under these circumstances we do not find the district court's January 24 order improper.

■ Defendant also challenges that portion of the January 24 order which deemed all issues not raised in the proceedings waived. However, during the proceedings defendant did not seek to raise any issues other than withdrawal of his guilty plea. On appeal, defendant has failed to show that he has been prejudiced in any way by the waiver portion of the order. Therefore, the issue is not properly before us. *Cf. State v. Standlee,* 96 Idaho 165, 168, 525 P.2d 360, 363 (1974).

No costs on appeal.

No attorney fees on appeal.

SHEPARD, BAKES and HUNTLEY, JJ., concur.

BISTLINE, Justice, dissenting.

Four months short of two long years ago this Court's opinion announced its decision affirming the death penalty imposed upon Thomas Creech. Since that time Creech has languished on death row because the majority of this Court obdurately refused to consider and decide whether Creech had been denied effective assistance of counsel when the trial court summarily had Creech brought before him so that Creech could enter a plea of guilty to a charge of first degree murder. Thrice, now, the Court has refused to pass upon that issue. The opportunity to do so was declined when the

---

1. Although not cited by the defendant, we take judicial notice of *State v. Howell,* 104 Idaho 393, 659 P.2d 147 (1983), where the Court of Appeals stated that a ruling on a motion to withdraw a guilty plea must be supported by written findings. *Howell* does not apply to this case for two reasons. First, the statement requiring written findings was dicta. Second, that case involved a motion to withdraw a guilty plea before sentencing.

Court's opinion was announced on May 23, 1981; declined again on September 23, 1981, when rehearing was denied; and again for the third time this 24th day of May, 1985.

Because on an automatic appeal it is the individual non-delegable obligation of each justice to search the record for error in a death penalty case, I did so, and reported to the other members of the Court my belief that we had before us a very strong case of denial of effective assistance of counsel, wherein Creech's case was likened unto *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969), both as to mandatory automatic appeal and the requirement of convincing proof that a guilty plea both voluntarily and intelligently made. That report is found in *State v. Creech,* 105 Idaho 362, 410–11, 670 P.2d 463, 511–12 (1983) (Bistline, J., dissenting). Therein I pointed out that:

> [I]n Idaho on automatic appeal from a death sentence, it was recently held that under I.C. § 19–827 "we may not ignore unchallenged errors.... We have previously recognized as much in this state by holding that fundamental error, even absent objection at trial will be reviewed on appeal." *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981). Obviously under this rule we are also obliged to make that same review on automatic appeal even though plain or fundamental error as was involved in *Boykin* is not assigned by appellate counsel.

The High Court in *Boykin* held that *"It was error, plain on the face of the record, for the trial judge to accept petitioner's guilty plea without an affirmative showing that it was intelligent and voluntary."* 395 U.S. at 242, 89 S.Ct. at 1711. The *Boykin* defendant pleaded guilty on his first arraignment; Mr. Creech pleaded not guilty initially. At a subsequent hearing when a guilty

plea was entered for him the *trial court* conducted the hearing, allowed cross-examination by the prosecutor, admitted the prosecutor's offered exhibits, and made oral findings:

> "THE COURT: Very well. Thank you very much, Mr. Creech. You may step down. I believe you have been very candid with the Court.

> "For the record, the Court will find that the defendant understands the nature of the offense to which he has just plead guilty and he understands the consequences of his plea of guilty, and that there is a factual basis for the guilty plea, and that the guilty plea was freely and voluntarily made.

> "I will accept the guilty plea and I will direct my Clerk to enter the same."

This does not satisfy my notions of due process. Time having run out on me, I must necessarily save for another time or some other place an in-depth review of this strange affair. Creech had pleaded not guilty, and in due time a jury would pass upon his guilt or innocence. His court-appointed attorney adamantly opposed the procedure—which was against his advice—and insisted on being allowed to withdraw from further representation of Creech. The motion was denied, although from that time on Mr. Creech really had no further need for the attorney whose advice he disregarded. Time permitting, Mr. Creech might have followed that advice, but the trial judge moved too precipitately for any meaningful reflection; at the time the trial judge assumed the responsibility for helping Mr. Creech along in his bent for self-destruction, for which Mr. Creech had a Gilmore-like penchant as the members of this Court personally observed in connection with the first *Creech* [1] case, and as

---

1. *State v. Creech,* 99 Idaho 779, 589 P.2d 114 (1979). This was the criminal conviction which placed Creech in the Idaho penitentiary. While Creech's appeal in that case was pending in this Court, Creech wrote directly to this Court. His letter, which was not rejected but received,

asked that this Court forego consideration of his appeal so that he did not have to endure the agony of suspense. Unlike the district judge in this case, this Court did not oblige Mr. Creech's wishes, although his 1978 letter to us was much like his August 1981 letter to the district court.

is more than amply demonstrated in various sections of the presentence report attachments, Mr. Creech was then and there divested of effective assistance of counsel—which was his guarantee under both the United States and Idaho Constitutions. The precipitate manner in which it all came about is not an acceptable procedure.

Creech, following the homicide at the penitentiary, was turned over to county authorities and incarcerated at the county jail. I have already mentioned the impermissible tape questioning transcripts of which one is in the presentence report along with other question and answer transcripts where he was given *Miranda* warnings prior to being taken through the same routine without the warnings.

From the jail Creech, the defendant, Creech the counseled defendant, wrote

THOMAS E. CREECH #14984
P.O. BOX 14, UNIT #7
BOISE, IDAHO 83707

TO: CHIEF JUSTICE
IDAHO SUPREME COURT
451 W. STATE ST.
BOISE, IDAHO 83707

DECEMBER, 26th, 1978

DEAR SIR,

I AM WRITING TO YOU IN REGARDS TO MY CASE. SIR, I HAVE BEEN IN MAXIMUM SECURITY AND SOLITARY CONFINEMENT NOW FOR OVER FOUR YEARS. STILL A DECISION HAS NOT BEEN MADE IN MY CASE. I CAN GET NO KIND OF PROGRAMING HERE AS LONG AS I'M IN A LIMBO STATUS. I CAN'T GET NO KIND OF PSYCHARTRIC TREATMENT THAT I NEED.

WHILE IT IT MAY BE EASY FOR SOME TO JUST SIT AND WAIT WHILE THERE LIFE PASSES IN FRONT OF THEM NOT REALLY KNOWING IF THEY WILL DIE OR LIVE, I CANNOT. SO I HEAR BY ASK THIS COURT TO MAKE A DECISION ON MY CASE. IF THE HONARABLE COURT CANNOT DO THIS THEN I ASK THAT ALL STAYS OF EXECUTION BE LIFTED AND THAT I BE EXECUTED AT THE EARLIEST POSSIBLE DATE. I CAN ACCEPT THE FATE OF DEATH BUT I CAN'T ACCEPT NOT KNOWING AND HAVING TO WAIT. THANK YOUR FOR YOUR TIME IN THIS MATTER.

RESPECTFULLY YOURS,

THOMAS E. CREECH

CC/FILE

In *Creech, supra,* at 411, 670 P.2d at 512, I used the occasion of my separate dissenting opinion to comment that:

In the first place I think that there is something lacking in our criminal justice system where criminal defendants are allowed to bypass their counsel and engage in direct dealings with the court. Such conduct in my view is improper, disruptive, productive of error and possible injustice, and cannot be tolerated. In so saying I level my criticism not at the particular judge, but at the practice. As alluded to above, in Mr. Creech's first case before this Court he took it upon himself to bypass counsel and write directly to the Court. And, he was not the first; nor was he the last. As often as such communications have been received and circulated to the Court membership, I have denounced and remonstrated against the practice continuing. It is an evil, and it will produce evil rewards. Since that time the Clerk of this Court has properly intercepted attempted direct communications with the Court by uncounseled defend-

his own letter to the district judge declaring that he wanted to enter a plea of guilty. Assuming the letter was received by the judge on the next day, as was probably so, the very next day after receipt, or at least no later than two days after the letter was sent, the judge apparently had Creech delivered to his courtroom, and apparently summonsed Creech's counsel as well. And then the hearing took place as aforesaid—of which the record contains a transcript.

Time has not altered my 1983 views. The very fact that the majority does not see fit to incorporate into the opinion for the Court the bizarre circumstances under which Thomas Creech was summarily brought before the court to substitute a plea of guilty for his earlier plea of not guilty, can suggest only that it is a factor which cannot be reckoned with and yet affirm the trial court.

As I have said, the most significant issue on this appeal, which the majority does not deign to address, is whether the defendant, Thomas Creech, was denied his constitutional right to effective assistance of counsel at the time he was ordered to be brought before the trial court and substituted his plea of guilty. If this was a denial of assistance of counsel, which I say that it was, then it was *per se* clearly a manifest injustice not to relieve him of that plea.

### I.A.

Important facts surrounding Creech's plea—unmentioned by the majority—need reviewing. On June 19, 1981 Creech was arraigned on a first degree murder charge for the killing of Dale Jensen. At that time he pled not guilty. A trial date was set for November 2, 1981.

On August 26, 1981 Creech wrote a letter to district judge Robert Newhouse, wherein he stated that he wished to change his not guilty plea to guilty. The letter was written without the knowledge or approval of Creech's counsel.

On August 28, 1981 Judge Newhouse summoned Creech and his attorney to appear before him. At that time, Creech's appointed counsel explicitly objected to Judge Newhouse's considering of Creech's request to plead guilty. Creech's counsel also requested a five-day continuance. His stated reasons were legitimate: notice of Creech's change of mind with respect to entering a guilty plea had come to him as a total surprise and in a sudden manner. Two weeks earlier, Creech's attorney was before the same trial judge on a prosecutor's motion to take a pretrial deposition of a potential state's witness. Tr., Vol. 1, p. 29.

It cannot with any regard for reality be said that Creech's counsel had been afforded a fair and reasonable opportunity to talk to Creech, ascertain his reasons for changing his mind, inform Creech of possible defenses, and detail the potential outcome of the case should it go to trial. Instead, Creech was actually encouraged to press forward with his change of plea to guilty.

### B.

The issue before us is not a challenge to the procedure which Judge Newhouse followed in accepting the guilty plea. Creech's counsel has conceded that the procedure Judge Newhouse went through in accepting Creech's guilty plea was technically proper. The fact remains, however, that such bears no direct relevance to the judicially imposed ineffective assistance of counsel. Where Creech proceeded of his own volition, and was judicially encouraged to do so, it was at the least a prima facie case of a constitutional violation. Moreover, if Creech entered his plea based upon any clearly erroneous assumption of law—perhaps not irreversible had counsel had a fair opportunity to confer with him, such a plea was definitely accepted from a defendant without effective assistance of counsel.

One of the fundamental principles of a valid guilty plea is a correct understanding on the defendant's part of the crime for

ants. The Court has done nothing, however to

halt the practice in trial courts.

which he has been charged. *State v. City Court of City of Tucson,* 131 Ariz. 236, 640 P.2d 167, 168 (1981); *Gonzales v. State,* 96 Nev. 562, 613 P.2d 410, 411 (1980); *Britain v. State,* 497 P.2d 543, 545 (Wyo.1972); *People v. Cumby,* 178 Colo. 31, 495 P.2d 223, 224–25 (1972); *State v. Byrd,* 203 Kan. 45, 453 P.2d 22, 29 (1969). When Creech changed his plea to guilty, Judge Newhouse made inquiry as to Creech's powers of comprehension:

Q. [JUDGE NEWHOUSE] What, as you understand it, does a person have to do to be guilty of the charge of first degree murder? What does it mean to you?

A. [CREECH] He has got to think about doing it.

Q. And killing someone.

A. And killing someone.

At the post-conviction hearing Creech stated further why he had earlier thought himself guilty of first degree murder:

Q. [KEHNE] Why did you write that letter to Judge Newhouse?

A. Because that's the way I felt.

Q. Okay. I want you to piece by piece put together for these people and Judge Newhouse why you felt that way.

A. For pleading guilty?

Q. Yes.

A. *Well, first of all, I thought that I was charged with first degree murder, which I had been told when that new law passed, that anybody that killed another inmate in prison that was already doing time for murder, that it was automatic first degree murder.*

Q. Okay.

A. And that was the main reason. Because I felt that, you know, it is obvious that he did die and I killed him. So I felt that I was guilty of it.

Q. *Would I be accurate to restate that as you felt it was useless or hopeless to go through further proceedings to try to find yourself guilty of some lesser charge or not guilty?*

A. *Well, I didn't—from my understanding of it, I thought that first degree was first degree. No matter what.*

Q. *So there was no defense. You felt there was no defense to the charge?*

A. *That is the way I understood it to be.*

Q. *By the time you wrote that letter, had you and any attorneys talked about the difference between manslaughter and first degree murder surrounding the case?*

A. *No.*

It is clear that Creech's guilty plea was based on an incorrect understanding of the elements required for proof of first degree murder. "Thinking about it" and then killing someone may not always amount to first degree murder. The killing of an inmate is, likewise, not always first degree murder either. In connection with that proposition, reverting back to August 28, 1981 and the change of plea hearing, it will be noted that when the trial judge did not ask Creech as to his intent, the prosecutor, on being allowed to examine Creech after the court's examination, did go into that aspect of the case:

BY MR. HARRIS:

Q. Mr. Creech, did you intend to kill Mr. Jensen?

MR. KEHNE: I'll object. It's not within the statute.

THE COURT: Overruled. You may answer.

THE WITNESS: When I first had the fight with him, no. But the second time, yes, I did intend to kill him.

Q. BY MR. HARRIS: That was later in the day?

A. Yes, sir.

Q. Did you take action to kill him after he was no longer a threat to you? Was in no condition to hurt you?

A. Yes, I did.

Q. What did that include? What did you do?

A. I kicked him in his throat and his head.

Q. Was that after he was unconscious?

A. He wasn't all the way unconscious, but he was down on the floor.

Q. Did you hit him with the sock after he had fallen to the floor?

A. I don't remember. The sock busted and the batteries fell out. I am not sure when that happened.

Q. Did they bust after you hit him with the sock?

A. Yes, sir.

Q. Did you think he was going to die after you left the cell the final time?

A. I thought that he would probably.

MR. HARRIS: That's all I have.

I.C. § 18–4003 defines degrees of murder, and subsections (c) and (e) declare:

(c) Any murder committed by a person under a sentence for murder in the first or second degree, including such persons on parole or probation from such sentence, shall be murder in the first degree.

(e) Any murder committed by a person incarcerated in a penal institution upon a person employed by the penal institution, another inmate of the penal institution or a visitor of the penal institution shall be murder of the first degree.

I.C. § 18–4001 defines murder, and § 18–4002 defines malice. These statutes read as follows:

**18–4001. Murder defined.** Murder is the unlawful killing of a human being with malice aforethought or the intentional application of torture to a human being, which results in the death of a human being.

**18–4002. Express and implied malice.** Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

Creech's understanding of murder was incorrect. The record fails to disclose that he knew anything about or ever was instructed of the concepts of "unlawful killing" or "malice aforethought." Creech's misunderstanding is not surprising though, because Judge Newhouse's decision to hurry along and accept Creech's guilty plea precluded Creech's counsel from having any meaningful opportunity to explain these matters to Creech. Such a lack of assistance of counsel, at such a crucial stage of the trial, can only be held to be a violation of Creech's constitutional rights to counsel under the Sixth Amendment of the United States Constitution and art. 1, § 13 of the Idaho Constitution. Accordingly, Creech should have been allowed to withdraw his guilty plea in order to avoid manifest injustice.

In *United States v. Cronic*, 466 U.S. 648, ——, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984), the United States Supreme Court provided fresh guidelines on an accused's constitutional right to assistance of counsel:

The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.[2]

No stage of a trial can be viewed as more critical than a hearing to determine if a guilty plea should be accepted. It is unimportant that Creech himself, at that time *pro se* for all practical purposes, declined to agree to a five-day continuance in order to confer with counsel, because, not being adequately informed of or comprehending the

---

**2.** The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, *or prevented from assisting the accused during a critical stage of the proceeding. See, e.g. Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *Brooks v. Tennessee,* 406 U.S. 605, 612–613, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972); *Hamilton v. Alabama,* 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961); *White v. Maryland,* 373 U.S. 59, 60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193 (1963) *(per curiam); Ferguson v. Georgia,* 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); *Williams v. Kaiser,* 323 U.S. 471, 475–476, 65 S.Ct. 363, 366, 89 L.Ed. 398 (1945). *Cronic, supra,* 466 U.S. at —— n. 25, 104 S.Ct. at 2047 n. 25.

possible defenses he might have, and the complete definition of the murder with which he was charged, Creech cannot by any stretch of the imagination be said to have acted voluntarily *and intelligently.*

Thus, unless the district court envisioned from its examination of Creech that Creech was possessed of the talent and skills of an experienced trial lawyer, only one legal conclusion can be drawn, and that is that the court denied Creech the assistance of counsel in violation of his constitutional rights. The underlying and determinative question to be asked, therefore, is whether Creech properly was permitted to assume his own representation. Under the guidelines announced by all of the opinions in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), and *Boykin, supra,* the answer must be a resounding "no."

### C.

In *Faretta,* the opinion for the Court held that a person may manage his own defense, but when he does so

he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forego those relinquished benefits. *Johnson v. Zerbst,* [304 U.S. 458,] 304 U.S., at 464–465, [58 S.Ct. 1019,] 58 S.Ct., at 1023 [82 L.Ed. 1461]. Cf. *Von Moltke v. Gillies,* 332 U.S. 708, 723–724, 68 S.Ct. 316, 323, 92 L.Ed. 309 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams v. United States ex rel. McCann,* [317 U.S. 269], 317 U.S., at 279, [63 S.Ct. 236,] 63 S.Ct., at 242 [87 L.Ed. 268]. *Faretta, supra,* at 835–36, 95 S.Ct. at 2541.

To that end, the trial court must first inform the defendant of the dangers and disadvantages of self-representation, and make adequate inquiry into his understanding of what he or she is waiving. Such was done in *Faretta* by the California state trial court.

Chief Justice Burger, writing separately for himself, Justice Blackmun, and Justice Rehnquist, wrote:

Although we have adopted an adversary system of criminal justice, see *Gideon v. Wainwright, supra,* the prosecution is more than an ordinary litigant, and the trial judge is not simply an automaton who insures that technical rules are adhered to. *Both* are charged with the duty of insuring that justice, in the broadest sense of that term, is achieved in every criminal trial. See *Brady v. Maryland,* 373 U.S. 83, 87, and n. 2, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963); *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). That goal is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel. The damage thus inflicted is not mitigated by the lame explanation that the defendant simply availed himself of the "freedom" "to go to jail under his own banner...." *United States ex rel. Maldonado v. Denno,* 348 F.2d 12, 15 (CA2 1965). The system of criminal justice should not be available as an instrument of self-destruction.

In short, both the "spirit and the logic" of the Sixth Amendment are that *every person accused of crime shall receive the fullest possible defense;* in the vast majority of cases this command can be honored only by means of the expressly guaranteed right to counsel, and *the trial judge is in the best position to determine whether the accused is capable of conducting his defense. True freedom of choice and society's interest in seeing that justice is achieved can be vindicated only if the trial court retains discre-*

*tion to reject any attempted waiver of counsel and insist that the accused be tried according to the Constitution. This discretion is as critical an element of basic fairness as a trial judge's discretion to decline to accept a plea of guilty.* See *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498–499, 30 L.Ed.2d 427 (1971). *Id.* at 839–40, 95 S.Ct. at 2543–44 (emphasis added).

Justice Blackmun, writing for himself, for the Chief Justice, and for Justice Rehnquist, wrote:

I cannot agree that there is anything in the Due Process Clause or the Sixth Amendment that requires the States to subordinate the solemn business of conducting a criminal prosecution to the whimsical—albeit voluntary—caprice of every accused who wishes to use his trial as a vehicle for personal or political self-gratification.

. . . .

... The road the Court has traveled from *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), to *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), need not be recounted here.. For our purposes, it is sufficient to recall that from start to finish *the development of the right to counsel has been based on the premise that representation by counsel is essential to ensure a fair trial. Faretta, supra,* at 849–51, 95 S.Ct. at 2548–49 (emphasis added).

What is clear from all the opinions is that the trial court has a duty to protect the defendant's rights under the Sixth Amendment.

The record before us in the instant case conspicuously lacks any evidence of any effort by the trial court to inform Creech of the risks he was taking in managing his own case. Moreover, the district court made no attempt to ascertain Creech's competency to understand the nature of the proceeding he was undertaking and the dangers involved. Unlike *Faretta, supra,* where the trial court insisted on a hearing to determine competency, the record before

us is clearly devoid of any attempt to provide a competency hearing for Creech, who was summarily allowed to take over the management of his own case. What happened is manifestly clear. Judge Newhouse allowed Creech to use the criminal system, in the words of Chief Justice Burger, *"as an instrument of self-destruction." Faretta, supra,* 422 U.S. at 840, 95 S.Ct. at 2543 (Burger, C.J., dissenting) (emphasis added).

It is certain that the trial court did not apply *Faretta,* or any part of it, in allowing Creech to supersede his attorney. Because denial of effective assistance of counsel constitutes manifest injustice, *see, e.g., Kennedy v. Maggio,* 725 F.2d 269, 273 (5th Cir.1984); *State v. Azure,* 175 Mont. 189, 573 P.2d 179, 183 (1977), *appeal after remand,* 179 Mont. 281, 587 P.2d 1297;. *Gregory v. State,* 550 P.2d 374, 378 (Alaska 1976); *People v. White,* 534 P.2d 642, 643 (Colo.App.1975); *People v. Baca,* 525 P.2d 1146, 1147 (1974), it was error on Judge Newhouse's part to deny Creech's motion to withdraw his guilty plea, a guilty plea which should not have been accepted in the first instance.

## II.A.

The rationale by which the majority affirms the trial court is sheer speculation after reviewing a cold record of the hearing on the motion to withdraw the guilty plea. The manner in which the trial court arrived at the determination to deny will never be known. The written decision which we have before us states only this:

This court, after considering the defendant's Motion to Withdraw his Guilty Plea, denies his request. (See Rule 33(c) of the Idaho Criminal Rule) Thomas Eugene Creech's plea and my sentence will stand! No Manifest injustice has been shown. A sentence of death is a tragic and extraordinary penalty, but when it is legally and properly imposed, execution must follow, or surely we are not a nation ruled and governed by law.

IT IS SO ORDERED.

This bald and cursory declaration is not supported by any findings of fact whatever or by any principles of law. Hence, it is incapable of review. In such instances proper findings are mandatory if there is to be any meaningful review. *State v. Stevens*, 98 Idaho 131, 559 P.2d 310 (1977).

Creech's counsel at oral argument candidly and courageously tendered an explanation for Judge Newhouses's failure to make findings and conclusions:

MR. KEHNE: ... I think there's a real serious need for a record in this kind of case. Neither this district judge, nor, I believe, anybody else, especially an elected officer, wants to do any favors for Thomas Eugene Creech, but I think in this particular case you have a burden in that the integrity of the courts of the state are on the line because you're asked to review and affirm where there are no findings of fact or conclusions of law. I submit that that's not—we just can't do that. I'll tell you what's really happening here when the judge doesn't want to put out findings of fact and conclusions of law. He's told me—and he's told many other young lawyers who've practiced in front of him when we've tried to get findings out of him— that "unless you have the Supreme Court case that forces me to or you get the Supreme Court to order me to, I'm not going to make findings." And then he goes on to explain how "old Judge Scoggins," in his words, said, "If you want to get affirmed you just have to keep your mouth shut. Now Judge Durtschi, he gets reversed more than anybody else. That's just 'cause he doesn't keep quiet on the record." And that's what's really happening here. And a lot of lawyers know it because a lot of lawyers have talked to Judge Newhouse about that. We've got a judge who's more interested in being affirmed than he is in being correct in applying the right rule of law. And I think that's a challenge that you have to pick up and tell him that Idaho courts do not operate that way. You

must make findings of fact and conclusions of law, especially in a death case.

....

Any judge, and even this judge, in any other ordinary case would have given me the time, a cooling off period. But for some reason everybody's in such a hurry in this case that we end up taking years we don't need to take. I think it was wrong. I don't think you should approve of it. I think you should disapprove of it and send it back.

To further buttress the unusual manner in which this case has been handled, Creech's counsel also pointed out in his brief the following:

The court's intrusion between Mr. Creech and his counsel was not only unlawful (absent a *Faretta* inquiry) it was also unseemly. The way this type of conduct reflects poorly on the judiciary should not escape the attention of this Court. This district judge was too publicity-conscious. Throughout the hearing of August 28, 1981, the district court judge made constant references to the press and to the public. Publicity from the waiting press seemed to be a major motive behind the court's insinuation between lawyer and client and denial of a continuance. Before dismissing this press-consciousness as mere healthy appreciation of the public interest, this Court should recall that the district court judge gave interviews on this case and allowed newspaper editorials to become part of the sentencing record.[3] This same judge also later appeared on television and had his picture published in the [Idaho] Statesman by the headline "Death Penalty: It's My Job." This judge gained his post by winning a contested election during which he courted the endorsement of the policeman's union. Appellant's Brief, p. 39.

Fortunately, or unfortunately, depending on point of view, the five members of this Court all subscribe to the Idaho Statesman, and we must concede to the veracity of the foregoing statement, other than that I my-

---

**3.** These may be found in *Creech, supra,* at 405– 07, 670 P.2d 506–08.

self have no recollection of reading any account of the final sentence above concerning the policeman's union. And, even if true, I do not readily see that statement as impugning the integrity of the district judge. And, as a known fact, media people are often the instigators of interviews which perhaps ought not to take place. That small facet of background is of little consequence. Properly, this Court should vacate the challenged order and remand to the district court for entry of findings and conclusions.

The majority's effort at disposing of our Court of Appeals' decision in *State v. Howell*, 104 Idaho 393, 659 P.2d 147 (Ct.App. 1983), by a footnote is pathetic, and better would not have been attempted. Earlier in the majority opinion *Kienlen v. United States*, 379 F.2d 20, 24 (10th Cir.1967) is cited for the proposition that "A motion to withdraw a guilty plea is addressed to the sound discretion of the district court." I readily accept that statement, and emphasize that the discretion the exercise of which is called for is a "sound discretion." This is so whether the motion is made before or after imposition of sentence. What did our Court of Appeals write in *Howell* which appears to have offended the majority? Only this:

> In our view the proper exercise of such discretion requires identifying the conflicting factors which should bear on the decision, and arriving at a decision based on a well-reasoned consideration of those factors. To assure that discretion has been exercised in this manner, and to provide for meaningful appellate review, the trial court should state on the record the factors upon which its decision is grounded. *Howell, supra*, at 397, 659 P.2d at 151.

Five months after *Howell*, our Court of Appeals, again unanimous, addressed the requirement of findings which will demonstrate to a reviewing court that judicial discretion has been soundly exercised, and in doing so gave our district courts sound advice, advice the Court would most likely respect if only it had emanated from this level in the first instance:

"Discretion" has been defined as a power or privilege to act unhampered by legal rule. Black's Law Dictionary at 553 (rev. 4th ed. 1968). However, "judicial discretion" is a more restrained concept. Lord Coke is said to have defined judicial discretion as an inquiry into "what would be just according to the laws in the premises." *Id.* Judicial discretion "requires an actual exercise of judgment and a consideration of the facts and circumstances which are necessary to make a sound, fair, and just determination, and a knowledge of the facts upon which the discretion may properly operate." 27 C.J.S. *Discretion* at 289 (1959). Discretion which violates these restraints is discretion abused.

Therefore, to determine whether discretion has been abused, an appellate court must ascertain whether the trial judge has correctly perceived the "law in the premises" and has demonstrated due "consideration of the facts and circumstances." ...

... *Appellate review of judicial discretion should not be result-oriented. An appellate court should not focus primarily upon the outcome of a discretionary decision below, but upon the process by which the trial judge reached his decision. In order for the appellate court to perform this function properly, it must be informed of the reasons for the trial court's decision.* Unless those reasons are obvious from the record itself, they must be stated by the trial judge. Where the reasons are neither obvious nor stated, the appellate court is left to speculate about the trial court's perception of the law and knowledge of the facts. *As a practical matter, the appellate court finds itself locked into a result-oriented review.*

. . . .

My greater concern is with the exercise of adjudicative discretion—discretion which determines or directly affects the outcome of litigation. Criminal sentencing, and child support, visitation and custody, are areas where discretion deter-

mines the outcome of a case. Granting relief from a default judgment and granting a new trial are examples of discretion which directly affects the outcome of litigation. Such acts of adjudicative discretion frequently are subjected to appellate review. Our deference to trial court action in these cases usually is based upon a recognition that the trial judge has actively participated in the proceedings below. *E.g., Smith v. Great Basin Grain Co.*, 98 Idaho 266, 561 P.2d 1299 (1977). The trial judge is in a better position than are we to evaluate the peculiar circumstances of each case, and to select among the available legal alternatives. *A statement of reasons for the trial judge's decision—unless otherwise obvious—is necessary to justify such appellate deference.*

. . . .

As noted in our principal opinion today, the Supreme Court has on several occasions encouraged trial judges to go beyond mere recital of grounds, and to state their reasons for granting new trials. We do the same in this case. However, the fact that such encouragement repeatedly has been given in the past indicates that encouragement alone is not enough. If we are to preserve sound judicial discretion at the trial court level, and to avoid result-oriented appellate review of such discretion, we should now take the final step and require particular reasons to be stated. *Sheets v. Agro-West, Inc.*, 104 Idaho 880, 887–890, 664 P.2d 787, 794–797 (1983).

Unlike the majority, I am not in the least reluctant to accept the fruits which flow from a judicially sound and laudable decision by our Court of Appeals, a court which by the nature of things deals far more often with criminal jurisprudence than does this Court. Were the majority willing this day to accept guidance from the Court of Appeals, it would accept that an appellate review of the district court's order cannot be made until we have the findings of fact and legal conclusions, or statement of reasoning which informs us that the trial court did engage in the exercise of a sound judicial discretion. Instead, however, the majority has elected to "pick and choose" from the record for bits of straw and paper to fashion poorly stated findings of its own which facially might seem to support its result-oriented decision—which is that "Thomas Eugene Creech's plea and my sentence will stand!"

If those members of the Court who comprise the majority would read the *Keinlen* case upon which they rely, the error in their ways might appear before their eyes. The Circuit Court of Appeals panel in *Kienlen*, ably led by Chief Judge Murrah—no stranger to the older practitioners here in Idaho who will remember his participation at Bar Commission proceedings in Boise anent adopting the Federal Rules of Civil Procedure—did *not*, as the majority apparently surmises, start with a bare-bones order such as the trial court entered here. Although that case did not involve the circumstance that the trial court had summarily displaced appointed counsel and allowed the accused to undertake the management of his own case, and to that extent was less involved, it did revolve around Kienlen's contention "that his plea of guilty was not voluntarily and intelligently entered." *Kienlen, supra*, at 23. The issue there was based not on a challenge as to "intelligently," but a challenge as to "voluntarily." The defendant there had pleaded not guilty, which was later changed to guilty. Later yet, he asserted that his change of plea was based upon incorrect advice of his appointed counsel as to the status of the law. The trial court there had *not* acted to interpose itself between attorney and client. Judge Murrah, writing for the Circuit Court, noted first:

We think that a competent individual who pleads guilty on the basis of incorrect advice as to what constitutes the requisite capacity to commit the crime ought not to be held to his plea. It thus becomes crucially important whether Kienlen relied upon the erroneous advice when he entered his change of plea. Judge Stanley recognized this *and in his comprehensive memorandum* found

that Kienlen did not rely on what his attorney told him as a basis for his guilty plea. *Kienlen, supra,* 379 F.2d at 27–28. What happened in Kienlen's case is not here important.[4] What is important is that, as one might expect, the trial court provided the appellate court with a comprehensive memorandum. Now, if the majority perceives that Judge Newhouse's terse order is a comprehensive memorandum, then, forsooth, I have wandered into the wrong profession. Knowing something of the federal system, I submit that the Circuit Court decision in *Kienlen* was not result-oriented, and was not the product of a searching of the record to find support for that result. Rather, I read *Kienlen* as a meaningful appellate review of the trial court's memorandum decision comprehensively detailing the facts found and principles of law applicable thereto.

For my part I admit to not having perused this record in order to fabricate findings, conclusions, and reasoning which can be said to support the challenged order. Nor do I intend to do so. Such is no more my function than the function of the other justices. We are a review court, and we did not hear one of the witnesses testify. What the trial bench and bar see today is an opinion from this review court which does not, cannot, review the discretion of the trial judge, but plunges directly into the merits of the motion itself, using a cold record to do so. The majority, as a preliminary to passing on the motion, has at the beginning of its opinion enumerated the nine grounds upon which the motion was based. In undertaking to come up with a set of findings, after referring to the nine enumerated grounds, the majority first groups them (the trial court *might* have done that), and then discusses the state's contentions vis a vis the defendant's, and in each instance the state prevails (the trial court might have done that).

Finally, the majority, just prior to its Part II, reaches the contention "that the district court should have included detailed findings of fact and conclusions of law." Declaring that "rulings on motions brought pursuant to the Uniform Post-Conviction Relief Act" may be required, this particular post-conviction proceeding is said to not be post-conviction, even though it is post-conviction, and it is also post-sentence, and it is also post-sentence affirmed-on-appeal— long before the motion was taken up by the trial court. The majority then declares that "the district court's order was adequate." It should be conceded, perhaps, that if the majority by its six-word disposition of that contention has set the standard for adequacy, then the trial court's six-word disposition [no manifest injustice has been shown] was a forerunner in the field of standard setting.

What has happened this day is exactly what the Court of Appeals forewarned against. The bothersome aspect of it all is that a serious doubt must be entertained as to whether the majority is able to perceive that *it* has made the findings and stated the reasoning for disallowing the withdrawal of the guilty plea. This it could have done two years ago when the motion was filed in this Court contemporaneously with the filing in the district court. This Court, however, has not heard the witnesses who testified, and improperly makes *its* own credibility assessment on a cold record, whereas, two years ago it could have truly supplanted itself for the trial court when the opportunity was presented, and could have had the witnesses testify in the courtroom of this Court.

The main error in the majority's unprecedented action taken today is that it still continues to avoid addressing the actions of the trial court in standing Creech's attorney in a corner, rendered useless, while the court dealt with Creech who was at that time managing his own case. Chief Justice Burger in his *Faretta* opinion saw fit to quote at length from the eloquence of the

---

4. The Circuit Court affirmed, but because of the state of the record (Kienlen had not testified on the issue) it added "we also leave the door open to the defendant Kienlen to initiate proceedings in the trial court at which he may submit testimony on the question of whether he relied on the erroneous advice given him." *Kienlen, supra,* 379 F.2d at 28.

Court's opinion in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), one of the first cases which began to deal with assistance of counsel and with the plight of defendants unaided by counsel. I select one sentence from that passage to close this effort—not an effort on behalf of Thomas Creech, but in behalf of the supposed science of criminal jurisprudence and in behalf of Everyman who is accused of criminal conduct:

> He requires the guiding hand of counsel at every step in the proceedings against him.

### ADDENDUM

Since the foregoing was written, the majority has attempted to bolster its opinion with the addition of an excerpt from the transcript relating to the defendant's decision to plead guilty. The majority continues to ignore the fundamental issue in this case—whether Thomas Creech was denied his constitutionally guaranteed right of effective assistance of counsel at the time he was ordered before the trial court and allowed to change his not guilty plea to guilty.

Counsel for Creech has conceded that the procedure which Judge Newhouse followed in accepting Creech's guilty plea was technically proper. But that conclusion is totally *irrelevant* in determining whether Creech was denied effective assistance of counsel. The majority refuses to explain how a technically proper entry of a guilty plea is valid if it was rendered in the absence of effective assistance of counsel.

The record speaks for itself, and the majority's silence with respect to the most significant issue on appeal also speaks for itself—Thomas Creech was denied effective assistance of counsel. Under no circumstances should Judge Newhouse have acted so precipitously. In the first instance, Creech's letter never should have reached the judge. But it did. Rather than convene a hearing hastily and immediately upon receipt of Creech's letter, Judge Newhouse should have forwarded it to Creech's counsel. At the very least, the judge should have granted Creech and his counsel reasonable time to allow Creech's counsel the opportunity to adequately explain possible defenses, and the actual elements of the crime for which Creech was being charged. Judge Newhouse and the State had everything to gain and nothing to lose by following such a procedure.

The majority's cite to *Faretta, supra,* obviously in response to my discussion of it, fails to apply the law contained therein to this case. As I have pointed out, under *Faretta,* before a trial court can permit a defendant to represent himself, it must inform the defendant of the dangers and disadvantages of self-representation, and make adequate inquiry into his understanding of what he is waiving. The record reveals that Judge Newhouse did absolutely nothing of the sort. Since the majority has at least acknowledged *Faretta* by referring to it, how can it explain its refusal to abide by its dictates?

The majority's refusal to address the real issues in this case, its willingness to review an unreviewable order by assuming the role of a district court to make findings of fact the district court should have made, and its decision to ignore the mandate of *Faretta, supra,* all go toward painting a picture of an appellate court rushing to judgment in a helter-skelter fashion. The result is that constitutional rights, reason, and fairness have been stampeded.